## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **Jimmie Otto Sneed II,** | ) |
| **Plaintiff,** | ) ) ) |
| v. | ) Case No. 21-cv-00185-JFH-CDL |
| **Sheriff of Rogers County, Scott Walton,** *in his official capacity*, | ) ) **ATTORNEY LIEN CLAIMED** ) **JURY TRIAL DEMANDED** |
| **Defendant.** | ) ) |

### **COMPLAINT**

**COMES NOW** the Plaintiff, Jimmie Otto Sneed II ("Plaintiff"), by and through his attorneys of record, and for his causes of action against the Defendants, alleges and states as follows:

### **PARTIES, JURISDICTION AND VENUE**

1. Plaintiff, Jimmie Otto Sneed II, is a citizen of Oklahoma.

2. Defendant Scott Walton ("Sheriff Walton" or "Defendant Walton") is, and was at all times relevant hereto, the Sheriff of Rogers County, Oklahoma, residing in Rogers County, Oklahoma and acting under color of state law. Sheriff Walton is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Walton in his official capacity, Plaintiff has brought suit against Rogers County/Rogers County Sheriff's Office ("RCSO"). Rogers County/RCSO is ultimately responsible for the well-being, including the health and safety of inmates housed at the Rogers County Jail. Defendant Walton, as Sheriff and the head of the Rogers County

Sheriff's Office, was, at all times relevant hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of RCSO, including the policies, practices, procedures, and/or customs that violated Mr. Sneed's rights as set forth in this Complaint.

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

4. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983.

5. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

6. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 5, as though fully set forth herein.

7. On or about July 19, 2017, Mr. Sneed, while in the custody of the Rogers County Sheriff's Office ("RCSO") in the Amos G. Ward Detention Center ("Jail"), was assaulted by multiple Jail and/or RCSO employees ("RCSO Officers"), including Detention Officer Birdsong, Sgt. Guess, Deputy Longhorn, Deputy Welch, Deputy Rose, Deputy Hamilton, Deputy Masingale, and/or Detention Officer Davis.

8. The RCSO Officers handcuffed Plaintiff and then forcibly extracted him from his cell, G-5, in the G housing unit. The Officers then dragged the handcuffed and compliant Plaintiff across the floor on the Jail into the general booking area of the Jail.

9. Once the RCSO Officers had dragged the handcuffed Plaintiff into the booking area, they placed him in a full body restraint system made by Safe Restraints, Inc. called "the Wrap."

10. While restrained by "the Wrap" a person is handcuffed with the handcuffs secured, via a stainless-steel locking carabiner, to a safety harness with stainless-steel locking buckles; they have their ankles strapped together and a leg restraint with stainless steel locking buckles tightly holds their legs together.

11. A person restrained by the Wrap is unable to move their arms or legs, thus unable to fight or flee.

12. After Mr. Sneed was completely restrained in the Wrap and clearly not a threat to anyone, an officer struck Mr. Sneed across the face and slammed him down on to the concrete.

13. RCSO Officers then placed Plaintiff in a restraint chair.

14. After Mr. Sneed was moved to the restraint chair, RCSO Officers grabbed his head and face, kneed and/or kicked him in the groin, and placed multiple hoods over his head.

15. The Officers' uses of excessive force on Mr. Sneed occurred while they were acting within the scope of their employment and acting under color of State law.

16. The Officers' uses of violent force, in striking Mr. Sneed after he was completely physically restrained, slamming him into the concrete, kicking and/or kneeing him in the groin, and/or grabbing his face; was patently unnecessary, completely disproportionate, objectively unreasonable and clearly excessive.

17. Most importantly, this infliction of pain on Mr. Sneed served absolutely no penological purpose and was unconstitutional as a matter of clearly established law.

18. The Officers' actions described above constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

19. As a direct and proximate result of the Officers' infliction of cruel and unusual punishment through their uses of force, Mr. Sneed suffered severe pain and suffering, physical injuries, and emotional and mental pain and anguish.

20. The entire sequence of the Officers uses of violent force on Mr. Sneed was captured by Jail surveillance cameras and reviewed by RCSO Undersheriff Jon Sappington and RCSO Captain Carter. Undersheriff Sappington and Captain Carter approved of the uses of force and made the determination that no disciplinary actions were needed, in essence ratifying the Officers' use of violent force and conceding that the use of violent force was appropriate under RCSO training, policy, procedure and/or custom.

21. On information and belief, the Jail surveillance video of these uses of force was intentionally destroyed by Defendant.

22. RCSO/Jail officers were not properly trained in how to safely restrain a person or when the use of force is appropriate.

23. This is evidenced by the fact that the user manual for the Wrap emphasizes that after a subject is secured in the Wrap, the user is to ***deescalate and evaluate***. Further, the user manual specifies that only "qualified personnel" are to apply or remove subjects from the Wrap. Upon information and belief, RCSO Officers were not properly trained on how to use the Wrap, and therefore cannot be considered "qualified personnel."

24. Upon information and belief, RCSO Officers were not properly trained on the appropriate uses of force, including on how to de-escalate a situation.

25. RCSO Officers were not properly supervised in their roles as Jail/RCSO employees, as evidenced by the fact that no one was disciplined for these clear and obvious uses of excessive force against Mr. Sneed. Upon information and belief, the Jail fostered a practice and/or custom of failing to discipline its employees for policy violations.

26. The uses of force against Plaintiff were also consistent with an established pattern of RCSO/Jail Officers unnecessarily placing Plaintiff in restraints and then subsequently using force on him.

27. Indeed, between August 2016 and July 21, 2017, RCSO/Jail Officers forcibly placed Plaintiff in the Wrap and/or a restraint chair no fewer than ten (10) times, often using force, such as hand strikes, leg strikes, and/or placing multiple hoods on Plaintiff, after he was fulling restrained.

28. RCSO/Jail Officers engaged in this barbaric behavior despite knowing that Plaintiff was susceptible to seizures. Indeed, Plaintiff had over a dozen seizures between August 2016 and July 21, 2017, yet RCSO/Jail employees continued to use unreasonable and excessive force on him while he was restrained.

29. Upon information and belief, no RCSO/Jail employees were disciplined for their uses of force on the restrained Plaintiff that occurred between August 2016 and July 21, 2017.

30. Upon information and belief, both the Sheriff and the Jail Administrator were aware of the uses of force described, *supra*.

31. From the time that Sheriff Walton took office in 2009 until 2017, when RCSO/Jail Officers assaulted Plaintiff, the Jail population steadily increased. Despite the Jail's maximum capacity of 250 inmates, the Jail regularly held upwards of 300 inmates at a time. During this time many of the inmates were not held in cells and there was not enough bed space for them, so inmates were forced to sleep on the floors.

32. Upon information and belief, the rampant overcrowding made it difficult for RCSO to find qualified individuals to work at the Jail, even if the Jail wished to address its understaffing issue. Former Undersheriff Jon Sappington has stated publicly, "[w]e also don't have the staff to house 250 inmates…[w]e've lost [staff] due to them walking back and seeing all the

inmates and saying, 'this isn't for me.'"

33. On information and belief, Sheriff Walton did not hire additional staff to handle the overpopulated Jail. This created an environment that was dangerous to inmates. In fact, Sheriff Walton publicly admitted that the Jail was way over capacity and the Jail "is a dangerous facility." Yet, despite these admissions, Sheriff Walton did nothing during this 8-year time period to decrease the Jail population and or the dangers created by the Jail's overpopulation.

34. Upon information and belief, Sheriff Walton was actually financially incentivized to ***not*** address the issue of Jail overcrowding. By agreeing to house Oklahoma Department of Corrections ("DOC") inmates, Sheriff Walton has ensured that the Jail receives extra revenue that totals $100,000 - $250,000/year.

35. As Sheriff Walton has acknowledged, when a jail is overcrowded and understaffed, tensions between inmates and jail employees increase. Understandably, inmates with constitutionally inadequate living conditions become frustrated and complain about their unacceptable discomfort.

36. Upon information and belief, the Jail's overcrowding, coupled with its pattern of being understaffed, led to increased tension between Jail staff and inmates, which substantially increased the risk of harm to inmates.

## CLAIMS FOR RELIEF

### Excessive Use of Force
### (Eighth Amendment; 42 U.S.C. § 1983)

37. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 36, as though fully set forth herein.

38. The Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences.

39. RCSO Officers' uses of violent force on the completely restrained Mr. Sneed, as described above, was excessive and constitutes unnecessary and wanton infliction of pain against Mr. Sneed. Indeed, RCSO Officers' uses of violent force, as described herein, was maliciously and sadistically calculated to cause harm, in violation of Mr. Sneed's clearly established Eighth Amendment rights.

40. Mr. Sneed suffered significant physical pain and mental anguish as a proximate result of RCSO Officers' excessive uses of force.

41. Mr. Sneed is entitled to compensatory damages in an amount to be determined at trial.

42. Sheriff Walton is the current Sheriff of Rogers County, Oklahoma, and is sued purely in his official capacity. As the elected Sheriff, Scott Walton is, in essence, a governmental entity. A claim against a state actor in his official capacity, such as Sheriff Walton, "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standard applicable to § 1983 claims against municipalities or counties. *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). *See also Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

43. There is an affirmative link between the aforementioned excessive force utilized by RCSO/Jail officers on Mr. Sneed and policies, practices and/or customs which Defendant Sheriff Scott Walton promulgated, created, implemented and/or possessed responsibility for.

44. Such policies, practices, and/or customs include, but are not limited to:

    a. Using restraint devices as punishment or to gain compliance;

    b. Using violent force against individuals who are fully mechanically restrained and pose no threat of harm to anyone;

    c. Understaffing - especially in light of the fact that the Jail was consistently overcrowded;

    d. Nonexistent or inadequate training of Jail employees, especially in the areas of de-escalation, proper uses of force, and training pertaining to the Wrap and restraint chair;

    e. Nonexistent or inadequate supervision of Jail employees, including, but not limited to:
        i. A custom of failing to report employee policy violations;
        ii. A custom of failing to discipline employees who commit policy violations; and
        A culture of tacitly endorsing instances of excessive force committed against inmates.

45. By the time that RCSO Officers repeatedly assaulted Mr. Sneed while he was completely restrained, there was an established and unabated custom of excessive use of force by RCSO detention officers. These prior instances of excessive force put Sheriff Walton on notice that the detention officers were inadequately trained and/or supervised with respect to the use of force. Sheriff Walton knew that there were serious deficiencies with the training and/or supervisions of detention offices that created excessive risks, but he failed to alleviate those risks.

46. Sheriff Walton knowingly failed to enforce policies necessary to the safety of citizens like Mr. Sneed in deliberate indifference to their constitutional rights

47. Sheriff Walton knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Mr. Sneed.

48. Sheriff Walton disregarded the known and/or obvious risks to the health and safety of inmates like Mr. Sneed.

49. Sheriff Walton through his continued encouragement, ratification and approval of the aforementioned policies, practices and/or customs, in spite of their known and/or obvious inadequacies and dangers, has been deliberately indifferent to inmates', including Mr. Sneed's, constitutionally protected right to safety.

50. Sheriff Walton is liable, in his official capacity, for these unconstitutional policies and customs.

51. There is an affirmative link between the unconstitutional acts of his subordinates and Defendant Walton's adoption and/or maintenance of the aforementioned policies, practices and/or customs.

52. As a direct and proximate result of the aforementioned policies, practices and/or customs, Mr. Sneed suffered the injuries and damages as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F

ATTORNEYS FOR PLAINTIFF